Good morning, Your Honors. May it please the Court, Rayvara Malvinado on behalf of the appellant, Juvenile Female YM. Your Honors, I would like to reserve 30 minutes for rebuttal time, if I may. You may. Back in 2006, this Court stated, over 30 years after the JDA was enacted, government law enforcement agents trampled even the most basic requirements of the JDA. Here we go again. This is another case where the Juvenile Delinquency Act, in every aspect, was violated. The first aspect was, when the juvenile was arrested, she was not immediately notified of what her rights were. Instead of notifying what her rights were, the officers testified that it is the policy of the Customs and Border Protection Office in Douglas, Arizona, to not speak with the juvenile until the ICE gives them permission to do so. This policy decision is in direct violation of the strict mandates put forth by Congress that a juvenile be immediately advised upon being taken into custody of what their rights are. The District Court said there was a valid reason to delay because they wanted to dismantle the muffler and the package before doing that. Is that in agreement with Ninth Circuit precedent? It is not, Your Honor. I think the District Court erred as a matter of law in concluding that the officers were justified in waiting that long. I believe that the District Court was under the impression that the JDA requires an immediate investigation or immediate questioning of a juvenile. It does not. What rights should the officers have notified the juvenile of? The Miranda rights, in a language comprehensible to a juvenile. And you have to give Miranda to somebody who hasn't been arrested? No, Your Honor. You have to give Miranda once someone is taken into custody. Well, this is, of course, at the border. We have slightly different set of rules that apply. And if they were dismantling the gas tank to find out whether there were drugs in the car and they haven't charged her with anything, they're not prepared to charge her with anything or arrest her, then what do they advise her of? Well, Your Honor, I think we're confusing two different issues here. One issue is the border search doctrine. The other issue is the Juvenile Delinquency Act. Now, the JDA is clear, once a juvenile is taken into custody, not when they're arrested, not when the drugs are found in the vehicle, but once that juvenile is in custody, that is the point in which the JDA kicks in. Here it is clear that she was in custody, even though it's at a border. She was taken into the cell, her shoes were taken away, her belt was taken away, her jewelry was taken away. At that point, she's in custody, even though the marijuana hadn't been found. Now, there are also officers testifying that said, yes, I saw an anomaly in the gas tank. I know for certain when I saw that anomaly that there were drugs in there. They also had a dog search around the vehicle and the canine alerted. At this point, it was clear to the officers that there were narcotics in the vehicle. And it was also clear, and the district court found, that the juvenile was, in fact, in custody. And at that point, she should have been read her Miranda rights. What prejudices adhere to the juvenile? The prejudice is deep, Your Honor. The only information contained in the information against the juvenile was her statement. Without the statement, there really isn't anything in the information that ties it. But is there any showing she wouldn't have spoken to the agents if she'd been given her rights earlier? Because she did get them later, twice, I think, in her mother's presence before she spoke. Isn't that right? That's clear, Your Honor, and I do want to make one thing very, very clear, is that this case is not about Miranda. No, I know, but it's about prejudice. It's about prejudice. And here we have again a juvenile who's been taken away all of her belongings, who's put in a room, who the evidence isn't clear whether she was handcuffed to a chair or not, but that's what she stated. And she's not given a meaningful opportunity to confer with her mother prior to being interrogated. We can't say for sure whether or not she would have invoked, the mother would have encouraged to invoke, if she had been told, yes, your daughter is accused of smuggling. There's something in the record somewhere. I can't remember now. I'm sorry. Exactly where is it? It seemed to indicate that the mother said, well, I think I just decided the best thing to do was for her to talk. Is that not in the record? That is in the record, Your Honor, but that occurred after. That was the testimony at the trial, but that was not – the question asked wasn't would you have invoked her rights? Would you have told her to invoke if you had known all the information? Did she say – did she confess anything to the officers before she was given her Miranda rights? She did not, Your Honor. The evidence is clear that they didn't start asking her any questions until after she was Miranda's. So – but your contention is if she had been given those rights an hour or two earlier, she might have not told them something? That, Your Honor, but we also have to look at the crux of the JDA is so that parents have a meaningful opportunity to confer with their juvenile before the interrogation begins. Okay. But the right to confer with their mother is a whole different problem from whether or not she was immediately given notification of her rights. That's correct, Your Honor, but it – Okay. So this is a different issue now that you're shifting to. It's a different point within the same issue. Well, I'm still trying to figure out the answer to – still trying to figure out the answer to Judge Arnold's question, which was what was the prejudice in not giving her rights immediately when she was taken into custody, even though the officers hadn't determined to arrest her yet? If she would have immediately been given her rights, we're not sure if she would have immediately invoked as well. There's nothing on the record that says, yes, I would have invoked. But the point here is that that burden's on the government to prove that it was harmless beyond a reasonable doubt. That burden is not on the juvenile to prove, but for these numerous violations of the JDA, she would not have confessed. Is the harmless – is the prejudice standard, as you stated, beyond a reasonable doubt? Is that the burden to show that – for the government to show that it was not prejudicial beyond a reasonable doubt? That is correct, Your Honor, and that's this circuit's holding. The most recent juvenile case does mention that it's a little odd to have a harmless beyond a reasonable doubt standard in a case that doesn't talk about a constitutional violation but a statutory violation. But that is this circuit's holding, Your Honor. Thank you. And going on to the JDA, the other points within that issue, the mother was not immediately notified by law enforcement agents of the arrest. Instead, the officers asked the juvenile herself to call. But wasn't that effective notification, regardless of who actually dialed the numbers, the mother was notified? That's effective notification that the mother was told by the juvenile, but that doesn't comply with this court's previous holdings. This court's previous holdings make clear that it can't be the juvenile. It has to be an arresting officer or someone associated with the case. What case says that? I'm going thinking about Jose D.L. and C.M., and in those cases, specifically one of the complaints that was made that was raised in one of those cases was that it was delegated to a secretary within the U.S. Attorney's Office to make the call. Was the call, in fact, made, though? The call was, in fact, made, but the prejudice still happened, and here's the reason why, Your Honor. The juvenile's parents must be immediately notified of what the rights are of the child and what the allegations are. Delegating to a juvenile the task of calling her mom. Well, those are two separate issues. One is notifying the parent, and the other is giving the warnings, right? Correct, Your Honor, but the notification necessitates the giving of the warnings. Do our cases say that the warnings have to be given in the phone call to the parent? They do, Your Honor, and it's the same immediate language that's in there. The juvenile must be immediately given their rights. The parent must be immediately notified. Her mother wasn't there, so I'm kind of wondering, again, what the problem is, since her mother wasn't home. Her mother wasn't home. The juvenile talked to the sister who related to the mother. If the officer had talked to the sister, should the officer have told the sister what the charges were? Probably not, because she was a 12-year-old. I think it would have been more appropriate to ask for an adult or to say, better yet, here's my phone number, have your mom call me back immediately, and so I can inform her of what her daughter's rights are and what the allegations are. I think that would have been more appropriate. She asked her sister to have her mom come over because she was in trouble to come over to the border. That's correct. Which her mom did, and her mom did come over, as far as we can tell, promptly. Her mom came over as fast as she could, and the other issue with that, Your Honor, is the JDA isn't complied with simply by having the mother present. Okay. So what should the officer have done here? The officer should have made the phone call themselves to the mother. By asking the juvenile to get the phone number out of her phone. Taking that. Because she said she didn't know the number. Exactly, Your Honor. Placing the call, asking to speak with the mother. If the mother was not available, leaving his or her phone number so that the mother can immediately call them back and learn of what is happening with her juvenile. Counsel, I'm looking at CM, the case that you said supports your argument that the warnings have to be given to the parents at the time they're called. So what language should I look to in CM that will inform me regarding that issue? Let me look for it, Your Honor, just a moment. I don't want you to waste your time. I got it, Your Honor. The JDA provides that parents shall immediately be notified. Immediately notified means the same in the context of advising the juvenile of her rights. Right, but that doesn't say that notification must include all of the warnings that you were addressing. Well, it says rights, Your Honor, and I think this circuit. What page are you on? That's 485F30 of 500. Okay, go ahead. And also in WNDG, if parents are not told that they may advise and counsel their children before interrogation, the protection intended by the statute will be realized only if the parents are particularly assertive in their dealings with law enforcement. The Congress has spoken clearly. You deal with juveniles differently than you do with adults. Under the Ninth Circuit cases, too, I think that the arresting officer not only has to make the call, but has to tell the parent that he or she has a right to consult with the juvenile, right, and a right to consult in private. That's correct, Your Honor. Although I'm not sure that's in the statute, but in any event, it's a gloss on the statute in the cases. Isn't that right? That's correct, Your Honor. I thought you were saying that the officers had to tell the parents, the Miranda warnings. I thought that's what you were saying. That is my understanding, Your Honor. If I may quote from D.L. Not their own Miranda warnings. You're not saying that. No, correct, Your Honor. They have to tell the parents the Miranda rights of the child. That's exactly correct, Your Honor. And in D.L., this Court has previously stated, juvenile's parents must be notified of the juvenile's Miranda rights to ensure that the JDA provides them with meaningful protection. And that's D.L. 453 F3rd at 1122. And the other case that you're referring to is Wendy G. 255 F3rd at 767. This Court has spoken clearly. The JDA is different. Does the record reflect that when the mother came, she was told of any rights that the juvenile had? The record reflects, Your Honor, that she immediately got down to the port of entry. She asked where her daughter was. She asked to speak with her, and she was told, you have to wait for the ICE special agent. It wasn't until about two and a half to three hours after the mother arrived that she was shuffled into the room to meet with her daughter, only for the purpose of being read the Miranda warnings. Now, this is three hours after the juvenile's been taken into custody. This is essentially three hours after the mother's been notified of her juvenile being in custody. That's not immediately. At that point, they're read Miranda, and the officer testifies that he went 15 feet out to get the Miranda form and to come back in. That's the only time that they were alone together for that very short amount of time. Miranda was read. Are you?  What time was she picked up? 1130, Your Honor. Okay. What time does her mother get there? Shortly thereafter. I don't remember if the record specifies. It's like 45 minutes, wasn't it? Somewhere around that, Your Honor. And then the interview didn't take place until 430. So it was not until 430 when the juvenile again was read Miranda along with the mother, and at that point they were informed of what the allegations were. In the meantime, she had not made any admissions. No admissions were made, Your Honor. That's correct. It wasn't until just before they were seeking to get the confession was the mother informed of what the allegations were. The difficulty I have with your argument is that not only do you have to show that there were some violations of the act, you also have to show that there was prejudice, and we interpreted prejudice to mean that some incriminating statements were made as a result of these violations, and that's the disconnect that I see in your argument, that you haven't connected the violations to any admissions or confessions that were used by the government. And that's a good point, Your Honor. I would just like to remind the Court again that it's not our obligation. It's the government's obligation to prove it's harmless beyond a reasonable doubt. There isn't a vow on the record that I put on the record that if the violations didn't occur, then maybe she would not have confessed, and that's what I would turn to when seeing whether or not the government has proved harmless beyond a reasonable doubt, and I don't think they have. We're talking about a juvenile, talking about someone under the age of 18, not being given a meaningful opportunity to confer with their mother, not being given an opportunity. But surely if there were some prejudice, you'd be able to point us to it, right? Well, I think the prejudice, Your Honor, is that her statement was using the information, but I think maybe the Court's question that we're trying to get at is was it a cause of the confession. Am I correct in assuming that? I think that's what the case is saying. Well, that's one prong. You have to see if it's a cause of the confession. If it is, then you go to the next prong, if it was harmless beyond a reasonable doubt. So the cause of the confession, here again we have a juvenile who's taken away from her parents, taken away from her friends, kept in a locked cell. We really have no idea. Those are violations. Those are all the violations, but that doesn't go to the prejudice. To the cause, I would just say because she was so afraid, because she was so scared, she was less likely to invoke. But, I mean, I think you're saying that the government's job is to show beyond a reasonable doubt that she would not have made these statements before the fact that these violations occurred. Isn't that what you're saying? That's correct, Your Honor. All right, counsel, you've exceeded your time. We'll hear from the government. Thank you, Your Honor. May it please the Court. I'm Elizabeth Strange from the U.S. Attorney's Office in Tucson representing the United States. The district court did not err in finding the juvenile was delinquent in this case. And turning first to the JDA violations, the court specifically addressed whether there was any prejudice in this case. And as the Court knows, the test for that is whether or not any violation was a cause of the confession. And that is a factual question which should be reviewed for clear error. And the Court in this case addressed that and said, no, there was no violation that was a cause of the confession. But you don't challenge the fact that there were violations? Well, let me clarify that. I think there were one or two violations, yes, Your Honor. First, to clarify the record, the judge did not make a finding as to who made the call. The judge said someone called the mother and the mother came right away. She didn't the judge, excuse me, did not make a finding of whether it was the daughter who called or the agent that called, but the judge said, well, there wasn't any prejudice. The call was made. What was the evidence in the record regarding who made the call? The daughter said that she didn't know the number, and the agent told her, well, call her on your cell phone. The agent who let the mother in, Officer Girard, said, well, I directed another agent to call. That agent got the number. That agent used my phone and my desk. The district court did not resolve that question of fact. The other violation, again, this was not prejudice, but NYSERDA case law does say that when the call is made, the Miranda rights should be given contemporaneously, and that's in Doe 4. To the parent. To the parent of the daughter's Miranda rights. But, again, there was no prejudice in this case because the Miranda rights were given twice. They weren't given right before asking for a confession. The first Miranda rights were given at 2.30. Both the testimony from the mom and the daughter was that they understood the rights, they knew that the daughter didn't have to talk, and that they voluntarily waived it. Now, the mother's testimony at trial was, I decided it was in her best interest. And the testimony from the daughter herself was that I knew I didn't have to talk, but, you know, I made – I was very deliberate in what I decided to tell the agent. I didn't tell him everything. I told him only what I was comfortable with. Now, the other point in the record I'd like to clear up is the court specifically found that the mother had spent time with the daughter before waiving the Miranda rights. And this was at SCR 2.339. The court noted that the agents didn't talk to the daughter about the incident until she had spent some time with the mother, until the rights had been given, understood, and they were waived. And the testimony from the daughter herself was my mother, quote, had been there for a while, and then she only told the agent what she was comfortable telling her. That's at SCR 2.400. So this was not a situation where there was prejudice as a result of the Miranda writing warnings. The other point of prejudice that's been alleged here was the timing of the arraignment. Again, there was no prejudice here because she was arraigned before the adults. And what the requirement is is that she's given priority in the arraigned on Monday. This offense happened on Sunday. There was no arraignment schedule on Sunday. But she and another juvenile were the first ones arraigned in Tucson in the arraignment schedule. So there is no showing here. And the court found that the government had met its burden to find that there wasn't any prejudice here caused by any of the violations. There's no due process violations alleged here. So the only thing you look at is whether or not the statutory violation was a cause, and the court found there was not a cause in this instance. She doesn't even argue that there was any prejudice on this issue. She doesn't even argue there was any prejudice from the late arraignment. The argument was made below, Your Honor, and I believe it was made below. I don't think so in the brief. What would the prejudice have been from the delayed arraignment? This Court has found that there is prejudice when the opportunity is taken to further interview the juvenile or to get more information from the juvenile in the time waiting for arraignment, and that simply didn't happen in this case. Well, what does the seem to me to be, I'm speaking for myself, and perhaps you've also said it as well, there seemed to be some, if not numerous, violations of the JDA here which may not have caused any prejudice. So my difficulty is what's the incentive for the government agents to obey the JDA if it doesn't seem to have any teeth in it? Well, Your Honor, I would not agree with the characterization that there were numerous violations. I think there may have been one or two statutory violations. I think that the ---- No, I understand that. I said that. I think that the agents were being very careful about how they dealt with the juvenile. Well, they may have been in general. I don't ---- I'm not saying they treated her roughly or anything or insensitive ---- that they were insensitive. But I'm wondering what's ---- what are the incentives here to follow the letter of the cases with respect to the way juveniles are processed in the criminal system? Well, Your Honor, the ---- this Court has said that unless the statutory violation caused prejudice, it should be affirmed. Now, in terms of creating an incentive, that's the law. The ---- It's up to Congress is essentially what you're saying. I'm sorry, Your Honor. I mean, it's up to Congress to put some teeth in this is what you're saying. Yes, sir. Okay. Yes, sir. But the agents ---- the reason to have the JDA is because you don't want to take advantage of the juvenile. And they did not take advantage of the juvenile in this case. They made a point of not interviewing her until her mother was there and giving her Miranda rights twice. Now, the other point I'd like to make clear on the record is when the mother arrived, the agents there both testified that they took her back immediately. There's absolutely no testimony from any agent that they then took her out of the room where she was. The testimony is as soon as she got there, and this was the policy at the border, is that when the parent arrives, you take the parent immediately back to be with the child. And that's what the testimony was from the agents. And when the ICE agent arrived at 430 to take her interview, his testimony was when I arrived, the mother was sitting there with the daughter. So there ---- I disagree with the characterization of the record that the testimony doesn't show that. I think the testimony is that the mother was with the child. If there are any other questions on the JDA, I'd like to perhaps turn to the Court. Does the Court have any other questions on the confrontation? I have a question on the duress defense. Yes, sir. I was a little uncertain about whether the district court held that she found Guayam's testimony credible, but that those facts did not make out a defense by way of duress, or whether the Court was saying, I don't really believe what Guayam is saying, or at least not all of it. I wasn't quite sure whether the Court made this decision based on credibility, determination, or not. Because it seemed to me that at one point the district court seemed to indicate that it believed everything that Guayam said, and then at another point didn't seem to. And also, this is a related question, the Court adverted to something called incomplete duress, which seems to be a concept under the sentencing guidelines. Can you speak to those matters generally? Yes. I think that the Court made findings that she may have believed the – I think the indication was that she may have believed part of what the juvenile said, but not all of it. When she went through – when the judge went through the reasons why the juvenile hadn't carried her burden in proving this affirmative defense, she began with the fact that a three-hour negotiation with D'Ante certainly doesn't suggest an immediate impending threat. But she also noted, well, there weren't any corroborative witnesses. There were no witnesses to this alleged threat. There were no witnesses to this alleged three-hour negotiation. And, in fact, the only testimony that was offered in support was the stipulated testimony from the mother. Now, the mother didn't testify, didn't come to trial that day. The – but the parties agreed to a stipulation of what her testimony would have been, not to the truth of it, but what it would have been. And that testimony was that – didn't mention anything of a threat, didn't mention feeling threatened or that her daughter felt threatened, didn't support the duress at all. The only mention of D'Ante in that stipulation was that she told D'Ante where her daughter was. So the – Well, I think that there was some kind of disturbance outside the house, wasn't there, that this person inquired, where's your daughter? Right. I – well, he came to the house. I don't know if it was a disturbance, but the mother's testimony was he came to the house looking for – looking for her daughter, and she told him where he was. But the testimony did not support, and that's what the Court found, it did not support duress. What the – what the Court found was that she was primarily motivated to make money. And she's the one who sought out the opportunity to transport the drugs. It took a lot of planning to do this. She had to get a car fixed. She had to get it registered two weeks ahead of time, and then she had to wait for the call from D'Ante. Now, the incomplete duress, it's a very high standard for the affirmative duress. I mean, immediate harm, the threat of that, and that's just one element, and that's the only element that the Court addressed because she didn't meet that one, and she didn't need to address the other two. What the Court noted was, well, when it comes to sentencing, this may be an issue that can be raised at sentencing, that perhaps this is something that doesn't meet the threshold of the affirmative defense, but it may be a sentencing factor that the Court considered at the time of sentencing. Is there a specific guideline? There is a specific guideline. I don't – if I can supplement that. Oh, that's okay.  It was obvious that operating in the back of the judge's mind the whole time was, well, I think perhaps these circumstances can be taken into account somehow in fixing the sentence, and so that's probably what I'm going to do. And so I'm not – I'm just not – I'm not going to hold that this was duress. Yes, Your Honor, and I would note that the sentence in this case was probation. Yes, I know. Eighteen months' probation, which suggests that she – that was perhaps one of the factors. But also, to answer your question as to credibility, the Court specifically found that her demeanor at the port of entry was not – was – did not support the suggestion that she was under immediate threat. She, through her own testimony, said, well, I – you know, I understood my rights. I felt comfortable, and I – you know, I only told the high stage of the case. Well, at that point, she was out of danger, though. Well, she was – I mean, there was some suggestion that there was a threat made to her mother or about her mother as well. Right. And the Court found that, well, she said she was more worried about her mother, but she never sought protection for her mother at the port of entry. But the testimony from the – Well, of course, at that point, she'd done – she'd already done what the – the threat had passed already. I mean, the threat, if it existed, was, if you don't go to the border with these drugs, I'm going to do something to you or to your mother. Well, she'd performed. So the threat had passed. So why would she feel threatened? Well, if – she might have felt threatened if she was going to be seen who set her up to do this. If what? I'm sorry? If she was – if she was giving names, oh, DeAnte is the one who set me up to do this. I mean – Well, that's different, though. That's a different kind of threat. That's a different kind of threat. Yes, sir. But – I wasn't quite sure what – why the district judge thought that that was of interest. But thank you. I think the district judge thought that was of interest because this is a juvenile, and the juvenile wasn't behaving – But it doesn't make – I'm sorry. I understand. Based on – on these findings, which were not clearly erroneous, the Court correctly found that the affirmative defense of duress had not been – had not been proven. Well, if it's – it might be – I mean, if it's a matter of law, the question is de novo. In other words, if the Court were to decide that these facts, assuming that the district judge believed them, made out a defense of duress, and, in fact, the district court did believe them, then – then there would be error. Well, it – I think the question is de novo review, yes, sir, of the sufficiency of the evidence. But the credibility findings and the findings of fact, this Court gives deference to credibility findings, and the review of facts by the fact finder, the review is generally – I have some difficulty knowing exactly what the facts were that were found because there was some – the district court at some point seemed to have believed everything that Y. M. said, and at other points seemed not to. So – but that's not – that's not your difficulty. That's mine. All right. Counsel, if you could wrap up, please. Yes. In this case, the – the district court found that the offense had been committed by a reasonable doubt and that the juvenile had not met the affirmative defense of proving by a preponderance of evidence that she committed the offense, which is what the duress offense is. Yes, I committed the offense, but I did it under duress, that, in fact, the juvenile had not shown that. So we ask that this Court affirm. Counsel, we'll give you one minute for rebuttal. You're welcome. On the issue of duress, I think it is appropriate to question it as a legal error. I think the Court committed a legal error in concluding that as the facts presented, as the facts of the district court found, that that did not rise to the level of immediate, impending, or present threat. And the district court said, I am not saying that Y.M. wasn't fearful, wasn't concerned, wasn't worried about her safety and the safety of her mother. I just don't think it rises to the level of present, immediate, or impending threat of death or serious bodily injury. So taking the district court's findings, I think the conclusion can be made that she committed legal error in that the facts actually did show that there was a present and impending threat towards juveniles. Back to the JDA issue, Jose D.L. said courts should not close their eyes to these continuing violations by mindlessly reciting the rubric of harmless error as an overarching excuse for ignoring what Congress has clearly ordained. That's what the government is asking you to do again. Just harmless error, no threat, no problem whatsoever. Agents can keep doing it. I ask for something different. Thank you, Your Honor. All right. Thank you, Counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case on calendar for argument is Westendorf v. West Coast Contractors of Nevada, Inc.
judges: Arnold, Rawlinson, Bybee